Fry *v.* Shipley.

Fry *v.* Shipley.

(*Nashville.* January 14, 1895.)

1. WILLS. *Pass money and notes, when.*

Money on deposit and promissory notes pass to the legatee under the residuary clause of a will bequeathing to him "all the money arising from the sale of my stock of every kind, and all of my loose property of every kind, which I direct to be sold as the law directs." (*Post, pp. 254–262.*)

Cases cited and approved: Jarnagan *v.* Conway, 2 Hum., 50; Maddox & Geldart's Rep., 119.

2. SAME. *Same.*

"Loose property" is synonymous with "movables" or personal property. Its meaning in this will is not restricted by the preceding clause to property of the nature of "stock" under the rule of *ejusdem generis*, nor by the subsequent clause directing sale. (*Post, pp. 258–260.*)

Cases cited and approved: Jarnagan *v.* Conway, 2 Hum., 49; Williams v. Williams, 10 Yer., 25; Edmondson *v.* Edmondson, 1 Tenn. Ch., 568.

3. SAME. *Rules of construction illustrated.*

Illustrations of the following rules of construction will be found in this opinion: (1) That a testator is presumed not to intend to die intestate as to any part of his property, and the Courts will resort to any fair and reasonable interpretation to prevent partial intestacy. (2) The testator's intention should be ascertained from the will itself, but the Courts will look to the facts and conditions surrounding him. (3) Grammatical construction of the language of a will ordinarily prevails, but the Court may transpose, reject, or supply words to carry out the testator's clearly ascertained intention. (*Post, pp. 255–258.*)

Fry *v.* Shipley.

Cases cited and approved: Williams *v.* Williams, 10 Yer., 25; Reid *v.* Hancock, 10 Hum., 368; Simpson *v.* Smith, 1 Sneed, 394.

FROM WHITE.

Appeal from Chancery Court of White County. B. M. WEBB, Ch.

W. J. FARRIS, M. A. CUMMINGS, W. T. MURRAY, STORY & GOFF for Complainants.

SNODGRASS & SMITHS, ADCOCK & ROBINSON for Defendants.

BEARD, J.   Nehemiah Rutherford died in White County, in this State, possessed of a considerable real and personal estate, and leaving a last will and testament, which was duly admitted to probate in that county. His estate consisted in part of $6,000 on deposit in the Bank of Sparta and about $1,500 in promissory notes. The complainants are of the next of kin of the testator, not provided for in his will, and they file this bill asking for a construction of this instrument and alleging that, as to this money and these notes, the testator died intestate, and that, as the result of such intestacy, they, with other distributees, named as defendants, are entitled to share in this part of his estate. Among the defendants to the bill is one J. W.

Orr. He is a devisee as well as one of the legatees of the will, and, as legatee, claims the funds in question under its fifth item or clause. This suit is narrowed to a controversy over this clause. For a proper understanding of this controversy, we embody in this opinion the various clauses of this will, as follows :

"*First.*—I direct that my funeral expenses and all my debts, if any, be paid as soon after my death as possible, out of any moneys that I may die possessed of, or may first come into the hands of my executor.

"*Second.*—I will and bequeath to my nephew, James W. Orr, my entire farm, or all the lands I own, or, in case that I should sell the same before I die, the proceeds is to be his.

"*Third.*—I direct, if there is any money on hand at my death, that my executor purchase out of the same a one hundred dollar tombstone and place it at the head of my grave, and should there be no cash on hand at my death, then, in that event, it is to be bought as soon as the money can be collected from my cash notes.

"*Fourth.*—I will and bequeath to Adaline, the colored woman now living with me, one hundred dollars, to be paid as soon as practicable by my executor, for her services since the late war.

"*Fifth.*—I will and bequeath to my nephew, James W. Orr, all the money arising from the sale of my stock of every kind, and all of my loose property

of every kind, which I direct to be sold as the law directs.

"*Sixth.*—The testator provides for the appointment by the County Court of an executor.

The general rules for the construction of a will, so far as it is necessary for them to be stated, are here given:

1. The Court is to ascertain the intention of the testator, and this intention is to be found within the will itself (Pritchard on Wills, Sec. 384), but this rule does not forbid a reference to the facts or conditions under which it was made. Pritchard on Wills, Sec. 409; Schouler on Wills, Sec. 466.

2. The presumption is that a man who under-dertakes to make a will does not intend to die intestate as to any part of his property, and the Court will place such a construction upon the instrument as to embrace within its operation all the testator's property, if this can be done by any fair interpretation or allowable implication. Pritchard on Wills, Sec. 386; *Williams* v. *Williams*, 10 Yer., 25.

3. The grammatical construction of the instrument must prevail where a contrary intention does not appear (Pritchard on Wills, Sec. 394); but where a grammatical construction would frustrate this intention, or where the words used are unintelligible, obscure, or absurd, and give no effect to the testator's manifest legal intention, then, in order to effectuate this, the Court may transpose, reject, or supply words. Pritchard on Wills, Sec. 395; *Reid*

v. *Hancock*, 10 Hum., 368; *Simpson* v. *Smith*, 1 Sneed, 394.

In the light of these rules, it will not be a difficult matter to ascertain the intention of the testator in this instrument. Rutherford was an old man, without wife or lineal descendants. He had lived on his farm in White County for a great number of years, where, by his frugality, he had accumulated a considerable estate. So far as this record shows, he lived alone, except for the fact he had in his service the negro woman, Adaline, who is mentioned in his will, and her husband. He was one of a family of eleven children, of whom he was the only survivor. His brothers and sisters were long since dead, leaving descendants scattered through several States. None of these lived in White County. No friendly intercourse seems ever to have existed between the testator and any one of these relatives, save in the case of his devisee and legatee, James W. Orr. This latter was a nephew, living in the eastern part of the State. For some reason, the uncle evinced a strong attachment for him. Their relations were of a very friendly character. Rutherford was an intense partisan, and their political sympathies were the same. At intervals they exchanged letters, and, at still longer intervals, this nephew made visits to his uncle, the latter generally soliciting the visit, and always paying the expense of the trip. While the testator was by nature and habit a secretive man in regard to his es-

Fry v. Shipley.

tate, and especially as to his money, yet he talked, during these visits, freely with his nephew about the value and character of his property, and sought advice from him as to investments, and gave him indications as to the final disposition of his property. It was this kinsman whom he desired to have at his bedside when death occurred; and it was his expressed wish that this nephew should finally take his estate, to the exclusion of his other relatives.

This preference, indicated by conversation and correspondence, was no less manifested in the testator's last will. Orr, of all his numerous and scattered relatives, is the only one mentioned or provided for in this instrument, and to him is given the farm, which complainants allege to be "very valuable," and "all the money arising from the sale of his stock of every kind, and all his loose property." In fact, he is given all of the estate which shall be left after the payment of the small legacy to his old servant, and of his debts and funeral expenses, including the purchase of a tombstone, unless it be, as complainants insist, that the money and choses in action were undisposed of. Having indicated in his social relations, and in his will, this decided regard for his nephew, and his purpose to make a generous provision for him, it would be, at least, remarkable that this testator should have been willing to die intestate as to so considerable a part of his estate, and to leave it for distribution among collateral kindred to whom he had been so indifferent in life.

17—10 P

On the contrary, we think it cannot be other-
wise than that the testator intended by this will to
dispose of all his property, and that he died sup-
posing he had done so. The question is, Has he
used apt words to effectuate this intention? The
answer to this question depends upon the construc-
tion of the fifth clause therein.

It will be seen the testator, before reaching this
item, has already provided for the payment of his
debts, etc., and has disposed of his realty, or its
proceeds if it should be sold by him during his
life. In other words, in the preceding clauses of
the will, after providing for debts, etc., he has
given all of his estate to his nephew, except the
personalty, and this fifth item deals with that ex-
clusively. If, in that clause, the testator had said,
"I will and bequeath to my nephew, James W.
Orr, all the money arising from the sale of my
stock of every kind, and all my property of every
kind," and had stopped there, then there could be
no question but that these words would have car-
ried to the legatee the title to both the money and
notes in controversy, for the word "property" is
a generic term, and includes both real estate and
personalty of all kinds, unless the context shows it
to used in a more limited sense. Pritchard on
Wills, Sec. 416; Schouler on Wills, Sec. 510. And
it has been frequently held to embrace money and
securities. *Arnold* v. *Arnold*, 2 Mylne & Keene,
365; *Pell* v. *Ball*, Spear's Ch., 48; *Hurdle* v.

*Outlaw*, 2 Jones' Eq., 75; *Stuckey* v. *Stuckey*, 1 Hill's Ch. (S. C.), 308; *Jarnagan* v. *Conway*, 2 Hum., 50. This being so, it cannot be that the use of the qualifying word "loose," before the word "property," works so radical a change in the latter as to exclude from its operation what would otherwise be within it on the plainest principles of construction. While it is an unusual word to use in the description of personalty, it is not an inapt one. In fact, one of its meanings, and evidently the one which was in the mind of this testator, is "not fixed," or its equivalents; "not stationery," or "susceptible of motion," and in this respect the terms "loose property," correspond with the word "movables," used by the law writers to cover all kinds of personal property, as contradistinguished from fixed or immovable property.

But it is insisted that the rule of *ejusdem generis* is to be applied here, and that the words "loose property" are limited in their effect by those preceding, to wit: "Stock of every kind." We do not think so. This is a residuary clause, and the use of the word "all" indicates clearly that the word "property" is not to be limited to the character or kind of property described in the clause preceding. It is sufficient on this point to refer to the cases of *Jarnagan* v. *Conway*, 2 Hum., 49; *Williams* v. *Williams*, 10 Yer., 25; and *Edmondson* v. *Edmondson*, 1 Tenn. Ch., 568.

But it is insisted that the words, "which I direct

to be sold as the law directs," necessarily exclude from the operation of the preceding phrase, "property of every kind," money, and promissory notes. To this contention it may be replied, it being, as before stated, a well settled rule of construction, that when this testator came to perform so solemn an act as to make his last will and testament, it will be presumed that it was not his intention to die intestate as to any part of his property; and, in addition, as the facts surrounding the execution, as well as the phraseology, of the instrument indicate clearly, it was the purpose of this testator to make James W. Orr his residuary legatee, the Court, in order to carry out this intention, will transpose, reject, or supply words, if it be necessary. For instance, this clause may be read as follows: "I will and bequeath to my nephew, James W. Orr, all the money arising from the sale of my stock of every kind, which I direct to be sold as the law directs, and all my loose property of every kind." The objection of tautology would not be more tenable after than before the transposition, because, both before and after the change, the testator gives "the money arising from the sale," etc., "which I direct to be sold as the law directs," etc.

But it is unnecessary to transpose in order to carry out the intention of the testator to make James W. Orr his full residuary legatee. This direction to sell, at the most, only implies uncertainty in the mind of

the testator as to what his personal estate may consist in at his death, and his intention that this residuary personal property, whatever its nature, shall be converted or collected for the benefit of the residuary legatee.

The case of *Hearne* v. *Wiggenton*, Maddox & Geldart's Rep., p. 119, was similar in many respects to the one at bar. In that case, the testator bequeathed various legacies of different kinds, such as wearing apparel, beds, bedding, as well as sums of money, to different legatees. One of these legatees was H, to whom was given, in one of the earlier clauses of the will, the sum of ten pounds. This same party, H, was made the residuary legatee in these words: "And all my other effects I will to" H, "to be sold for his benefit," and the question was, whether, under this clause, money in the funds passed, or only the residue of the testator's goods. The conclusion of Sir John Leach, Vice Chancellor, on this clause, was as follows: "The rule in question is, whether a general residuary gift is to be limited and qualified to property which is the subject of sale; however, the testator has added that his residuary property is to be sold for the benefit of his residuary legatee. It is uncertain at the making of the will what the testator's property may consist of at his death, and the direction to sell implies only a general intention on the part of the testator that his residuary property shall be converted or collected for the benefit of his residuary legatee."

Fry *v.* Shipley.

So, in this case, we say, the manifest purpose of this testator was, that his residuary personal property, of all kinds, should be collected or converted for the benefit of his residuary legatee, James W. Orr. The Chancellor having held otherwise, his decree is reversed, and the bills of the complainants are dismissed. The complainants will pay the costs of this Court and the Court below.